IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-00746-BR

| | | |
|---|---|---|
| A HAND OF HOPE PREGNANCY RESOURCE CENTER, a North Carolina not-for-profit corporation, doing business and ministry as Your Choice Pregnancy Clinic, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| CITY OF RALEIGH, a North Carolina municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the court on the motion for partial summary judgment filed by

plaintiff A Hand of Hope Pregnancy Resource Center ("Hand of Hope").  (DE # 46.)  Defendant

the City of Raleigh (the "City") filed a response in opposition, (DE # 54), in which it argues that

it is entitled to partial summary judgment.  Also before the court is the motion for preliminary

injunction filed by Hand of Hope.  (DE # 25.)  The issues raised have been fully briefed and are

therefore ripe for disposition.

## I.  BACKGROUND

Hand of Hope is a not-for-profit religious organization that operates a pregnancy resource

center called Your Choice Pregnancy Clinic in Raleigh, North Carolina.  (Am. Compl., DE # 40,

¶¶ 3, 12.)[1]  As set forth in its mission statement, Hand of Hope's primary objective is to "affirm

the value of life from conception by compassionately sharing the gospel of Jesus Christ[.]"  (Id.,

---

[1] Hand of Hope's amended complaint is verified.  Therefore, it may be considered in resolving Hand of Hope's motion for partial summary judgment.  See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (citations omitted)).

Ex. A, at 33.)  Part of Hand of Hope's services are religious in nature, with clients being offered prayer, Bible study, and spiritual counseling.  (Id. ¶ 22.)  Hand of Hope also provides clients with free reproductive healthcare information, physician-quality pregnancy testing, limited obstetrical ultrasounds, pregnancy counseling and support, post-abortion support, and life skills classes.  (Id.)

Hand of Hope previously operated Your Choice Pregnancy Clinic at a building located on 1701 Jones Franklin Road in Raleigh.  (Summers Decl., DE # 49-2, ¶ 8.)  In December 2015, Hand of Hope purchased a .9 acre parcel of land located at 1522 Jones Franklin Road (the "Property") with the intention of relocating Your Choice Pregnancy Clinic.  (Am. Compl., DE # 40, ¶¶ 16, 19-20.)  The Property is currently improved with a single family home, (id. ¶17), and is located in an area zoned Residential-4 with Special Highway Overlay District-2, (id. 27).  The Property is immediately adjacent to an abortion clinic, A Preferred Women's Health Care Center of Raleigh ("A Preferred Women's Health Center"), located at 1604 Jones Franklin Road.  (Id. ¶ 16.)  The location at 1604 Jones Franklin Road was rezoned in 1996 from a residential zoning classification to a commercial one at the request of a prior owner, who was a real estate appraiser.  (Eldredge Decl., Ex. 22, DE # 56-9, at 2.)  As a result, A Preferred Women's Health Center is currently located on a lot zoned Office Mixed Use-3 stories.  (Am. Compl., DE # 40, ¶¶ 27-28.)

The City's zoning procedures and regulations are set forth in the Raleigh Unified Development Ordinance (the "UDO").  (See Ordinance Adopting UDO, DE # 12-2.)  The UDO contains an Allowed Principal Use Table (the "Table") that identifies in which zoning districts each use listed is allowed as a matter of right without any further approval by the City.  (See UDO Excerpts, Ex. 3, DE # 12-3, at 3-6.)  The Table lists that "civic uses" are permitted as of

right in residential zones.[2]  (Id. at 4.)  "Civic uses" are defined in the UDO as "[p]laces of public assembly that provide ongoing governmental, life safety, educational and cultural services to the general public, as well as meeting areas for religious practice."  (Id. at 8.)  The term "civic use" embraces "[p]laces of worship including church, mosque, synagogue, [or] temple."  (Id.)  The Table also lists that "medical uses" are not permitted within residential zones.  (Id. at 4.)  The term "medical use" is defined in the UDO as "[a] facility providing medical or surgical care to patients."  (Id. at 12.)

The City has both an Existing Land Use Map, (Am. Compl., DE # 40, ¶ 27), which shows how the land within its jurisdiction is currently zoned, and a Future Land Use Map, (id. ¶ 26), which reflects the 2030 Comprehensive Plan for the City of Raleigh ("2030 Comprehensive Plan") and how the City ultimately intends for the land to be zoned.[3]  On the Existing Land Use Map, the Property directly adjoins lots zoned for office and mixed use along its northern, southern, and eastern property lines.  (Id. ¶¶ 27-28.)  The adjacent lots to the west, however, are zoned for residential use.  (Id.)  On the Future Land Use Map, the Property is zoned as "Office/Research & Development" as are all adjacent properties.  (Id. ¶ 26.)

After purchasing the Property, Hand of Hope sought guidance from the City regarding whether its pregnancy resource center was a permissible use of the Property.  (Id. ¶ 36; Summers Decl., DE # 49-2, ¶¶ 17-18.)  The City's zoning officials advised Hand of Hope that rezoning would be necessary.  (Summers Decl., DE # 49-2, ¶¶ 17-18.)  Hand of Hope subsequently sought rezoning approval from the City to operate its pregnancy resource center on the Property.  (Am.

---

[2] The Table lists that civic uses are "limited uses" allowed in all residential zoning districts because such uses must comply with the transitional protective yard limitation established in Article 6.3.1 E of the UDO.  (See UDO Excerpts, Ex. 3, DE # 12-3, at 4.)  However, the City acknowledges that civic uses are essentially permitted as of right in residential zoning districts under the UDO.  (See Def.'s Resp., DE # 54, at 3.)

[3] The City adopted the 2030 Comprehensive Plan on 7 October 2009.  (Third Crane Decl., DE # 56-1, ¶ 2.)

Compl., DE # 40, ¶¶ 34-35.)  On 8 January 2016, Hand of Hope's representatives attended a required pre-application meeting with Daniel Band, the City's Long Range Planner, who confirmed that rezoning was necessary and advised that the proposed use of the Property was consistent with office mixed use zoning.[4]  (Id. ¶ 36; Summers Decl., DE # 49-2, ¶¶ 20, 22.)  Band also indicated that Hand of Hope's proposed use was consistent with the Future Land Use Map and the 2030 Comprehensive Plan.  (Summers Decl., DE # 49-2, ¶ 22.)

Hand of Hope submitted a rezoning request to the City in April 2016 requesting the Property be rezoned to office mixed use.  (See Am. Compl., DE # 40, Ex. C.)  Hand of Hope's application was reviewed at several public meetings, including (1) a neighborhood meeting on 12 February 2016, (2) a Citizen Advisory Council ("CAC") meeting on 23 February 2016, (3) a second CAC meeting on 26 April 2016, and (4) a hearing of the Raleigh Planning Commission (the "Commission") on 10 May 2016.  (Id. ¶ 37.)  At the second CAC meeting, Hand of Hope's application was approved by a vote of 30 to 17.  (Id. ¶ 38.)  Thereafter, the Commission voted unanimously to recommend approval of Hand of Hope's application to the city council.[5]  (Id. ¶ 39.)  In addition, the City's zoning staff prepared a report, (id., Ex. D., at 49-50), and a compatibility analysis, (id., Ex. D., at 51-57), setting forth their findings that Hand of Hope's proposed use was compatible with the Future Land Use Map and the policies of 2030 Comprehensive Plan.

---

[4] The UDO requires a rezoning applicant to "schedule a pre-application conference with the Planning and Development Officer to discuss the procedures, standards, and regulations required for approval" before submitting an application for rezoning.  (UDO Article 10.2.4, DE # 56-5, at 1.)
[5] North Carolina law requires planning commission review and a formal hearing before the city council may act on a rezoning request.  N.C. Gen. Stat. §§ 160A-383, 160A-387.  When acting on a rezoning request, the planning commission and city council must consider any comprehensive plan that has been adopted, and the city council must provide a statement explaining whether its action is consistent with the comprehensive plan and why it considers the action taken to be reasonable and in the public interest.  Id. § 160A-383.

On 5 July 2016, Hand of Hope's rezoning request was considered by the city council at a public hearing.  (Id. ¶ 44.)  The meeting minutes show that one council member observed that, even though the rezoning request was consistent with the Future Land Use Map, it was inconsistent with six of the policies contained in the 2030 Comprehensive Plan.  (See 7/5/16 Raleigh City Council Tr., DE # 15-3, at 4-6.)  The council member further stated that the rezoning request was not in the public's interest as proposed because "lot-by-lot piecemeal" rezoning of residential parcels within a larger area designated for office use would "have detrimental impacts on the remaining residents' properties" and "create a less efficient use of office development."  (Id. at 4-5.)  The council member then made a motion to deny Hand of Hope's rezoning request as "premature."  (Id. at 6.)  The motion was seconded, and the city council voted unanimously to deny the rezoning request.[6]  (Id.)

On 17 August 2016, Hand of Hope commenced the instant lawsuit challenging the City's decision to deny its rezoning request.  (See Compl., DE # 1.)  Shortly after this suit was filed, the City's attorney informed Hand of Hope that the UDO contained procedures allowing for an official zoning interpretation.  (Am. Compl., DE # 40, ¶ 48; Leapley Decl., DE # 15, ¶ 3.)  Based on this representation, on 15 September 2016, Hand of Hope submitted a "Code Interpretation Request Form" to Assistant Planning Director Travis Crane.  (See Pl.'s App. to Statement of Material Facts, Ex. 6, DE # 49-6.)  On the request form, Hand of Hope asked Crane to determine whether its proposed use of the Property would qualify as a civic use under the UDO.  (Id. at 3.)  The request form went on to describe Hand of Hope as a "religious organization" that intended to

---

[6] Once a request for rezoning has been denied, "no other application for rezoning of that property can be accepted for a two-year period unless that rule is waived by the City Council."  (See Pl.'s App. to Statement of Material Facts., Ex. 4, DE # 49-4, at 2.)

use the Property to provide free pregnancy support to clients, including "pregnancy testing, pregnancy counseling, limited obstetrical ultrasounds, Life Skills classes, and post-abortion support counseling." (Id. at 4.)

After receiving Hand of Hope's interpretation request, Crane reviewed the submitted materials and also examined Hand of Hope's public website. (Crane Decl., DE # 12, ¶ 14.) On 3 October 2016, Crane sent an email to Hand of Hope's attorney, Noel Sterett, asking 14 follow-up questions about Hand of Hope's proposed use of the Property. (See id., Ex. 8, DE # 12-9.) Hand of Hope submitted a response letter on 19 October 2016. (See id., Ex. 9, DE # 12-10.) In response to Question 4 regarding the percentage of its activities that involved the direct provision of medical services, including pregnancy testing and ultrasounds, Hand of Hope answered:

> Hand of Hope does not provide medical treatment, care, or prescribe drugs to the women who come to Hand of Hope for help and information. Every single woman who comes to Hand of Hope is informed of Hand of Hope's Life Skills Program which includes Bible studies and every single woman is offered prayer for themselves and their child. As such, all of Hand of Hope's activities are motivated by their sincerely held religious beliefs and mission and involve prayer and the proclamation of the Gospel: God loves you and has a plan for your life and the life of your child. The vast majority of the women come to Hand of Hope to receive a free and confidential pregnancy test and to learn more about their pregnancy. If a pregnancy test is positive, the women are offered an opportunity to view their baby through the use of a non-diagnostic ultrasound.

(Id. at 2-3.) Because Hand of Hope maintained that its proposed activities did not involve medical services, it did not offer direct responses to Crane's additional questions regarding the number of people it expected to receive medical services onsite, the percentage of the floor area of the building that would be used to provide medical services, and the amount of time a healthcare professional would be present onsite. (Id. at 3, 5.)

On 1 November 2016, Crane issued an official zoning code interpretation. (See Official Zoning Code Interpretation, DE # 26-7, at 2-4.) The interpretation included Hand of Hope's 19

October 2016 response letter.  (See id. at 5-9.)  Based on the statements made by Hand of Hope in the response letter, Crane concluded that "the use as described is consistent with the 'civic' use category, and therefore permitted within the Residential-4 zoning district."  (Id. at 4.)  Crane, however, stressed that "[t]he information provided by Hand of Hope in [the] response [letter] was insufficient to conclusively clarify questions related to Hand of Hope's use on the property." (Id. at 3.)  For instance, Crane noted that while Hand of Hope's response letter stated that its intended use of the Property was not medical in nature, this response contradicted statements made by Hand of Hope in its suit against the City, which referred to Hand of Hope's "'Medical Director' and 'RN' (presumably Registered Nurse)."  (Id.)  Due to these discrepancies, Crane noted that if Hand of Hope intended to provide medical treatment, the Property was not a location where a "medical use" could be operated.  (Id. at 2-3.)  Crane therefore urged Hand of Hope to "notify the Zoning Enforcement Administrator immediately if any of the assumptions set forth in this official zoning code interpretation are partially or wholly erroneous as the applicability of this interpretation may be impacted."  (Id. at 3.)

The entity that owns A Preferred Women's Health Center appealed Crane's interpretation to the Raleigh Board of Adjustment (the "Board"), and a hearing was held on the matter on 13 February 2017.  (Am. Compl., DE # 40, ¶¶ 52-53.)  At the hearing, the Board heard testimony from Crane regarding how he made the official zoning interpretation.  (Id. at 22-28.)  The Board specifically questioned Crane about whether or not a property could have more than one principal use, such as a medical use and a civic use.  (Id. at 28.)  Crane responded that there could be more than one principal use of a property, and that in such a situation, each identified use of the property would need to comply with the zoning provisions in the UDO.  (Id.)

Following Crane's testimony, the Board heard testimony from Calia Hales, the co-owner and administrator of A Preferred Women's Health Center, who expressed concern that Hand of Hope intended to perform "medical testing" on the Property that fell within the UDO's definition of medical use.[7] (See 2/13/17 Board of Adjustment Hearing Tr., DE # 35, at 16.) Hales testified that the documentation Hand of Hope had submitted to the City showed that it used urine samples to perform physician-quality pregnancy testing, and that federal law required a license in order to test such samples. (Id. at 17.) Additionally, Hales testified that Hand of Hope's use of ultrasounds "to confirm a heartbeat or the presence of a fetus and fetal parts is a confirmation of a viable pregnancy, which is a medical test[]." (Id. at 18.)

The Board also heard testimony from Sterett and Tonya Baker Nelson, the founder and chief executive officer of Hand of Hope. Sterett iterated Hand of Hope's position that the ultrasounds provided to its clients were "nondiagnostic." (Id. at 32-33, 44-46.) Sterett stressed that Hand of Hope used ultrasound technology as a tool to communicate its religious message rather than to provide medical care. (Id.) However, he also acknowledged that Hand of Hope had a licensed medical director, and was required to have one in order to operate the ultrasound technology. (Id. at 30, 38.) With respect to Hand of Hope's use of ultrasounds, Nelson explained that the ultrasounds offered at its existing location were performed by registered nurses as required by North Carolina law. (Id. at 41-42.) Nelson further described how the nurses used the ultrasounds to see if "there's a viable pregnancy, the heart is beating, the baby is in the uterus, and . . . the probable gestational age according to [the client's] [last menstrual

---

[7] In its appeal, A Preferred Women's Health Center also challenged the zoning interpretation on the ground that Hand of Hope's provision of pregnancy testing, limited obstetrical ultrasounds, and STI testing constituted a medical use under the UDO. However, at the hearing, A Preferred Women's Health Center removed STI testing from the appeal based on testimony from Tonya Baker Nelson that all of Hand of Hope's STI testing is done by the county health department. (2/13/17 Board of Adjustment Hearing Tr., DE # 35, at 47.)

period]." (Id. at 41.)  The medical director of Hand of Hope was not present at the hearing, and

Hand of Hope could not provide a response to the Board's questions regarding the percentage of

its activities that involved a medical component.  (Id. at 45-46.)

After hearing arguments from the parties, the Board voted 3-2 to reverse the official

zoning interpretation.  (Id. at 63.)  The Certified Board of Adjustment minutes show that the

Board made the following relevant "Findings of Fact": Hand of Hope has a licensed physician

serve as a medical director; ultrasounds are performed exclusively by licensed nurses; Hand of

Hope keeps records of ultrasounds; the performance of an ultrasound "requires medical

knowledge to identify what is seen on the screen"; and the use of ultrasounds to confirm

pregnancy "constitutes a diagnostic procedure."  (Certified Board of Adjustment Minutes, DE #

36, at 7.)  In addition, the Certified Board of Adjustment minutes show the Board made the

following "Conclusions of Law":

> The proposed use of property by Hand of Hope to perform ultrasounds to confirm
> pregnancy by licensed nurses under the supervision of a medical director is a
> medical use, and the interpretation by [Crane] that the proposed use is a civic use
> allowed in the R-4 zoning district must be reversed.

(Id.)

Following the Board's decision, Hand of Hope amended its complaint in the instant

action to set forth the full procedural history of the zoning interpretation process.  (See Am.

Compl., DE # 40.)  In the amended complaint, Hand of Hope alleges that the City's actions in

denying it permission to provide free pregnancy support—including the use of limited obstetrical

ultrasounds—at the Property violates the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § 2000cc et seq., and the First and Fourteenth Amendments of the

United States Constitution.  (Id. ¶¶ 58-74, 88-101, 110-19, 120-27.)  Hand of Hope further

9

claims that the City's actions place an undue burden on a woman's fundamental right to have access to information concerning pregnancy, and violate unspecified constitutional rights of unborn children.  (Id. ¶¶ 75-87, 102-109.)

## II.  ANALYSIS

### A.  Motions for Summary Judgment

Hand of Hope moves for partial summary judgment against the City with respect to its claims under the equal terms provision of RLUIPA, the Free Speech Clause of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  (Pl.'s Mot., DE # 46, at 1, 2-3.)  The City cross-moves for partial summary judgment in its favor on the same three claims.  (Def.'s Resp., DE # 54, at 12.)  A court need not reach a constitutional question "if there exists an alternative, nonconstitutional basis for [its] decision."  Hoffman v. Hunt, 126 F.3d 575, 582 (4th Cir. 1997).  Therefore, the court will first consider Hand of Hope's statutory claim under RLUIPA's equal terms provision, 42 U.S.C. § 2000cc(b)(1), before turning to its constitutional claims.

#### 1.  Standard of Review

Summary judgment is appropriate where the record, viewed in the light most favorable to the non-moving party, shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  A fact is material if proof of its existence or non-existence would affect disposition of the case under applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  When faced with cross-motions for summary judgment, the court must ask "whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251; see also Desmond v. PNGI Charles Town Gamin, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011) ("When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure.").

The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Specifically, the moving party bears the burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which the moving party believes demonstrate an absence of any genuine issue of material fact. Id. at 323. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The court must view the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party, Shealy, 929 F.2d at 1011, but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir.1993) (internal quotation marks omitted). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish an essential element of the party's claim on which he will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

## 2. Equal Terms Provision of RLUIPA

Both parties move for summary judgment on Hand of Hope's claim under the equal terms provision of RLUIPA. The equal terms provisions provides that "[n]o government shall impose

or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Under this provision, a religious assembly or institution bears the initial burden to "produce[] prima facie evidence to support a claim" of unequal treatment, after which the "government . . . bear[s] the burden of persuasion on any element of the claim." Id. § 2000cc-2(b).

Hand of Hope's equal terms claim centers on the City's alleged discriminatory application of the UDO to the Property. Specifically, Hand of Hope alleges that the City violated the equal terms provision by permitting other religious and non-religious assemblies with "like uses" to locate as of right in residential zones under the UDO's civic use provision while, at the same time, preventing Hand of Hope from operating its pregnancy resource center in a residential zone. (Pl.'s Supp. Mem., DE # 47, at 14-15.) In other words, Hand of Hope raises an as-applied equal terms challenge. See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty., 450 F.3d 1295, 1311 (11th Cir. 2006) (noting that "a neutral statute's *application* may violate the Equal Terms provision if it differentially treats *similarly situated* religious and nonreligious assemblies").

RLUIPA does not define the meaning of "equal terms," and the Fourth Circuit Court of Appeals has not addressed its meaning. Both parties recognize that there have been three different tests developed by other circuits to make an equal terms comparison: (1) the "regulatory purpose" test; (2) the "accepted zoning criteria" test; and (3) the "functional intents and purposes" test. (See Pl.'s Supp. Mem., DE # 47, at 13 (discussing the conflicting approaches in other circuits); (Def.'s Resp., DE # 54, at 16-17 (same discussion).) Although each test uses different metrics, all three tests require a religious institution bringing an as-applied equal terms challenge to produce prima facie evidence showing that it was treated less well than a similarly

12

situated comparator.  See River of Life Kindgom Ministries v. Vill. of Hazel Crest, Ill., 611 F.3d 367, 371-73 (7th Cir. 2010) (noting that both the "regulatory purpose" test and the "accepted zoning criteria" test require the court to evaluate the similarities between a claimant and the comparator when a religious entity challenges an ordinance that does not explicitly single out religious entities); Primera Iglesia, 450 F.3d at 1311 (applying the "functional intents and purpose" test, and noting that "[a] plaintiff bringing an as-applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation").

Under the Third Circuit's regulatory purpose test, "a regulation will violate the Equal Terms Provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to regulatory purpose*."  Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 266 (3d Cir. 2007).  The Seventh Circuit has adopted a similar rule to the Third Circuit's rule but considers secular assemblies or institutions that are similarly situated as to "accepted zoning criteria" rather than the regulatory purpose.  River of Life, 611 F.3d at 371.  By contrast, the Eleventh Circuit has adopted the "functional intent and purposes" test, which distinguishes claims based on the nature of the zoning ordinance.  Midrash Sephardi Inc. v. Town of Surfside, 366 F.3d 1214, 1230 (11th Cir. 2004), cert. denied, 543 U.S. 1146 (2005); see also Primera Iglesia, 450 F.3d at 1308-09 (reviewing Midrash and explaining the kinds of equal terms statutory violations).

Although both parties contend that they are entitled to summary judgment irrespective of which circuit's test is applied, the parties mainly debate whether or not the City's exclusion of Hand of Hope's pregnancy resource center from the Property is justified by the zoning provisions in the UDO which differentiate between civic uses and medical uses.  In other words,

13

the parties' dispute centers on whether Hand of Hope fulfills the relevant zoning criteria in the same way as its identified comparators. From these arguments, it appears that the parties agree the accepted zoning criteria test is the most appropriate test to apply in the instant case.

Under the "accepted zoning criteria" test, a religious institution cannot be treated less favorably than a secular institution "if the two institutions cannot be distinguished on the basis of the 'accepted zoning criteria'" that define the zone. <u>Corp. of the Catholic Archbishop of Seattle v. City of Seattle</u>, 28 F. Supp. 3d 1163, 1167-68 (W.D. Wash. 2014). To support its equal terms claim, Hand of Hope points to four comparators it claims the City allowed to locate in a residential zone pursuant to the UDO's civic use provision: a church or religious education building, a university, the Kiwanis Club, and an emergency medical service ("EMS") station. (Pl.'s Supp. Mem., DE # 47, at 14-16.) The City concedes that Hand of Hope intends to engage in religious and educational activities on the Property that fit within the UDO's definition of a civic use. (<u>See</u> Def.'s Resp., DE # 54, at 18 ("Pregnancy education, religious support, Bible studies, Life Skills classes and an office related to these activities are all currently permitted at [the Property].").) The City nonetheless argues that it did not violate the equal terms provision because the Board entered a binding determination that Hand of Hope's proposed use of the Property to perform ultrasounds constitutes a medical use, which the UDO prohibits both religious and secular assemblies from operating in residential zones. (<u>Id.</u> at 11, 14-15.) The City further argues that it is entitled to summary judgment on this issue because Hand of Hope "compar[es] itself to organizations that do not provide on-site medical care or ignores the clear language of the UDO by identifying organizations that cannot locate in [r]esidential zoning districts." (<u>Id.</u> at 18.)

The court first addresses the City's argument that Hand of Hope's equal terms claim is foreclosed by the Board's decision that Hand of Hope intends to operate a medical use at the Property. The City cites to Williams v. City of Columbia, 906 F.2d 994, 996 (4th Cir. 1990), as support for its argument that the Board's decision precludes Hand of Hope's equal terms claim. (Def.'s Resp., DE # 54, at 14.) The Williams decision, however, made clear that a district court must defer only to a state agency's findings of fact, not legal conclusions. See Williams, 906 F.2d at 996 (holding that the district court's deference to the local zoning board extended only to findings of fact and that the court gave appropriate review to the legal questions involved). There is no dispute over the Board's factual findings in the present case. (See Pl.'s Reply, DE # 61, at 6 n.3.) The parties' dispute centers on the Board's "Conclusions of Law" that "[t]he proposed use of property by Hand of Hope to perform ultrasounds to confirm pregnancy by licensed nurses under the supervision of a licensed physician is a medical use[.]" (Certified Board of Adjustment Minutes, DE # 36, at 7.) Because the court is not bound by this legal conclusion, the Board's determination regarding this issue does not resolve Hand of Hope's equal terms claim.

The court next turns to the issue of whether Hand of Hope has met its initial burden to produce evidence showing that the City discriminatorily applied the UDO's zoning regulations against it, as opposed to other similarly situated organizations. The City contends that Hand of Hope has failed to establish a prima facie case for any of its identified comparators because there is no evidence that Hand of Hope's proposed pregnancy resource center fulfills the zoning criteria in the same way as the comparators fulfilled them. (Def.'s Resp., DE # 54, at 13-14.) The City further argues that its differential treatment of Hand of Hope is justified by the accepted zoning criteria because the evidence shows that each comparator operates a solely civic use,

while Hand of Hope generates additional concerns due to the fact it operates a separate medical use. (Def.'s Resp., DE # 54, at 14.) Hand of Hope responds that the City's characterization of its use of ultrasounds as a second principal use contradicts the plain language of the UDO. (Pl.'s Reply, DE # 61, at 2.) It is therefore Hand of Hope's position that the City "artificially divide[d] [the] pregnancy resource center into two 'principal' uses by parsing its unitary activity." (Pl.'s Reply, DE # 61, at 2.)

In its reply brief, Hand of Hope points to the definition of "principal building or use" set forth in Chapter 12 of the UDO to support its contention that a property can have only one principal use. (Id.) However, that section of the UDO is not in the record. See Fed. R. Civ. P. 56(c) (requiring that assertions of material fact be supported by "particular parts of materials in the record"). The court notes that Hand of Hope's proffered interpretation conflicts with the testimony of Crane, who represented to the Board that a building could have more than one principal use. (See 2/13/17 Board of Adjustment Hearing Tr., DE # 35, at 28.) Additionally, the UDO outlines the factors that are relevant to the consideration of whether a particular use or activity is a principal use or an accessory use of a building. (See Crane Decl., UDO Excerpts, Ex. 3, DE # 12-3, at 2.) These factors include the "the type and amount of activity, the hours of operation, the type of customers or residents, how goods or services are sold and delivered, [and the] likely impact on surrounding properties and site conditions." (Id.) In a situation such as here, where the proposed use of a property has multiple components, it is possible that each use of a property could generate similar concerns with respect the frequency of activity, the times of days services are offered, and parking and traffic demands. Thus, what evidence is in the record suggests that the UDO's definition of principal use extends beyond a single use of a property.

Even assuming that the UDO restricts the definition of principal use to a singular use, the evidence in the record is insufficient to determine whether or not Hand of Hope's proposed use of the Property is a principal civic use based on the accepted zoning criteria. In this case, the parties agree that certain components of Hand of Hope's proposed use fit within the UDO's definition of a civic use. However, in the materials attached to its amended complaint, Hand of Hope acknowledges that its pregnancy resource center provides "[m]edical services . . . under the supervision and direction of a licensed physician." (See Commitment of Care and Competence, Am. Compl., Ex. B, DE # 40, at 38). Although Hand of Hope argues that the ultrasounds offered to its clients are non-diagnostic, the Board made a binding factual finding that Hand of Hope's use of ultrasounds to confirm pregnancy "constitutes a diagnostic procedure." (Certified Board of Adjustment Minutes, DE # 36, at 7.) Furthermore, there is uncontroverted testimony from Hales that a pregnancy test is a diagnostic tool used to confirm pregnancy. (See Transcript of 2/13/17 Board of Adjustment Hearing, DE # 35, at 47-48.) Thus, in addition to the civic activities Hand of Hope intends to offer on the Property, the evidence shows that Hand of Hope intends to offer medical testing on the Property that fits within the "medical use" category described in the UDO. (See UDO Excerpts, Ex. 3, DE # 12-3, at 12) (defining "medical use" as facility providing medical care to patients, such as a medical clinic or physician's office).

As previously discussed, the UDO explains that the classification of a principal use is based on a number of factors such as "the type and amount of activity, the hours of operation, the type of customers or residents, how goods or services are sold and or delivered, [and the] likely impact on surrounding properties and site conditions." (See Crane Decl., UDO Excerpts, Ex. 3, DE # 12-3, at 2.) During the Board hearing and the interpretation process, Hand of Hope did not provide detailed information about the frequency and impact of its medical activities. However,

by Hand of Hope's own admission, "[t]he vast *majority* of the women come to Hand of Hope to receive a free and confidential pregnancy test and to learn more about their pregnancy. If a pregnancy test is positive, the women are offered an opportunity to view their baby through the use of a non-diagnostic ultrasound." (Official Zoning Code Interpretation, DE # 26-7, at 7 (emphasis added).) The very fact the available evidence reveals that a significant part of Hand of Hope's services involves medical testing generates a question of fact regarding whether Hand of Hope's proposed use of the Property is a principal civic use.

In sum, regardless of whether the UDO allows a property to have more than one principal use, there is a genuine issue of fact regarding whether Hand of Hope has met its burden of showing that it fulfills the accepted zoning criteria in the same way as its identified comparators, who operate solely civic uses.

The court further notes that, even assuming that the entirety of Hand of Hope's proposed use is a principal civic use similar to its identified comparators, Hand of Hope still must come forward with evidence showing that its identified comparators received more favorable treatment. As noted previously, Hand of Hope has identified four comparators: a church or religious education building, a university, the Kiwanis club, and an EMS station. The equal terms provision of RLUIPA requires a comparison between a religious assembly and a nonreligious assembly. See 42 U.S.C. § 2000cc(b)(1); Third Church of Christ, Scientist, of N.Y. City v. City of New York, 626 F.3d 667, 669 (2d Cir. 2010) (requiring a secular comparator for a RLUIPA equal terms claim). As a result, Hand of Hope cannot base its equal terms claim on the differential treatment it received in comparison to a church or a religious education building. The court will therefore limit its analysis to the three secular comparators identified by Hand of Hope.

18

### a. College, Community College, or University

First, Hand of Hope insists that its activities closely resemble those of "university, medical college, nursing school, and all their accessory uses, which would no doubt include the use of technology of all kinds (including the use of medical equipment)." (Pl.'s Supp. Mem., DE # 47, at 15.) The City does not dispute that the UDO defines civic use to include the use of a property as a "[c]ollege, community college, [or] university." (See UDO Excerpts, Ex. 3, DE # 12-3, at 8.) However, the City argues that the mere listing of universities as permitted civic uses in the UDO is insufficient to establish an equal terms violation. (Def.'s Resp., DE # 54, at 14-15.) As support for this argument, the City points to the Table, which shows that colleges, community colleges, and universities are not permitted within residential zones. (See UDO Excerpts, Ex. 3, # DE # 12-3, at 4 (listing that a "college, community college, or university" may not operate in a residential zoning district).) Because the Table confirms that the UDO treats these institutions the same as Hand of Hope, the court agrees with the City that this comparison cannot support Hand of Hope's equal terms claim. See 42 U.S.C. § 2000cc(b)(1) ("No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on *less than equal terms* with a nonreligious assembly or institution." (emphasis added)).

### b. Kiwanis Club

Hand of Hope also compares its activities to those of the Kiwanis Club. (Pl.'s Supp. Mem., DE # 47, at 14.) Although Hand of Hope compares itself to the Kiwanis Club as a whole, it only offers one example of a Kiwanis Club which it claims is similarly situated. Hand of Hope alleges that the Kiwanis Club of Raleigh has historically provided medical treatment to members of the Raleigh community. To show unequal treatment, Hand of Hope has submitted a document

19

entitled "A Short History of the Kiwanis Club of Raleigh." (See Short History of Kiwanis Club of Raleigh, DE # 26-8.) The timeline set forth in this document indicates that the Kiwanis Club of Raleigh provided bi-annual health screenings and dental exams at the "Boys Club" from 1979 until 1990. (Id. at 17.) In response, the City argues that the document on which Hand of Hope relies is inadmissible. (Def.'s Resp., DE # 54, at 15.) The City further argues that, even taking the document into consideration, the information submitted about the Kiwanis Club of Raleigh fails to demonstrate that that the Kiwanis Club of Raleigh has conducted any medical activity in one of the City's residential zones. (Id. at 14-15.)

Assuming Hand of Hope's submission describing the Kiwanis Club of Raleigh's activities is admissible, this document does not identify the location of the Boys Club where the Kiwanis Club of Raleigh offered its health screenings and dental exams. There is also no other evidence in the record establishing the location of the Kiwanis Club of Raleigh. While a civic club is a permitted use in a residential zone, the evidence in the record does not indicate that the Kiwanis Club of Raleigh's activities took place in a residential zone rather than a zoning district where medical uses are permitted. See Vision Church v. Village of Long Grove, 468 F.3d 975, 1002-03 (7th Cir. 2007) (finding no unequal treatment and rejecting argument from a church that restaurants and health clubs that the church considered comparable land users were treated more favorably than the church because these secular entities were located in a commercial district rather than in the residential district in which the church sought to build).

Furthermore, the history of the Kiwanis Club of Raleigh outlined in Hand of Hope's submission shows the health screenings and dental exams occurred on a biannual basis and were no longer offered after 1990. (See Short History of Kiwanis Club of Raleigh, DE # 26-8, at 17.) Given this timeline, it is apparent that the Kiwanis Club of Raleigh's medical activities took

20

place under the City's prior zoning ordinance, which was in effect until 2013. (See Ordinance Adopting UDO in 2013, Crane Decl., Ex. 2, DE # 12-2.) Other circuits have recognized that "organizations subject to different land-use regimes may well not be sufficiently similar to support a discriminatory-enforcement challenge." Third Church of Christ, 626 F.3d at 669; see also Vision Church, 468 F.3d at 1003 (noting the fact that church and its comparator "were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment"). The evidence presented therefore does not support a reasonable inference that the City applied the UDO in a manner that treats Hand of Hope's activities differently than those of the Kiwanis Club of Raleigh.

### c. EMS Facility

Finally, Hand of Hope argues that the medical component of its activities is no different than that of an EMS station, which it claims the City allows to provide medical treatment in residential zones. The City does not deny its EMS stations are located in residential zones within Raleigh. (See Def.'s Resp., DE # 54, at 16.) The City, however, contends that an EMS station is not a valid comparator because its operations are limited to residential activities and do not include the provision of medical services. (Id. (citing Williams Decl., DE # 60 ¶¶ 5-6 (stating that "Wake EMS stations are not designed or licensed for patient intake or routine patient treatment at the station" and that staff members provide medical care "at the setting in which the patient became ill or injured and during transport for patients requiring medically supervised transport").) Accordingly, the City argues that an EMS station is not a similarly situated comparator to Hand of Hope because an EMS station operates a principal civic use. (Def.'s Resp., DE # 54, at 16.)

As discussed above, there is a genuine issue of fact regarding whether Hand of Hope's proposed use of the Property fits within the UDO's definition of a principal civic use. Consequently, the court cannot determine whether an EMS station is a similarly situated comparator with respect to the UDO's zoning regulations. Because the circumstances prevents summary judgment for either side on this matter, the court will not decide Hand of Hope's equal terms claim as a matter of law.

### 3. Freedom of Speech under the First Amendment

Hand of Hope also argues that the City violated its First Amendment right of free speech by discriminating against Hand of Hope on the basis of its religious viewpoint and the content of its pro-life message. (Pl.'s Supp. Mem., DE # 47, at 16.) As with its RLUIPA claim, Hand of Hope's free speech argument highlights the provision in the UDO permitting civic uses as of right in residential zones. Hand of Hope maintains that its use of ultrasound imaging to communicate its pro-life message is a civic use. (Id. at 17-18.) According to Hand of Hope, the City's determination that its use of ultrasounds is a separate medical use restricts "Hand of Hope's ability to use its own property as a location from which it can communicate its message and of the manner in which it provides free pregnancy education." (Id. at 16.)

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002) (internal quotation marks and citations omitted). The First Amendment's proscriptions against governmental restrictions on speech is applied to the City through the Fourteenth Amendment. See Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 792 n.2 (1984) ("Under

the Fourteenth Amendment, city ordinances are within the scope of [the First Amendment's] limitation on governmental authority.").

Hand of Hope devotes numerous pages in its brief to analysis of cases that recognize the display of photographs and images of aborted fetuses as a form of protected speech. (Pl.'s Supp. Mem., DE # 47, at 17.) Hand of Hope analogizes its use of live ultrasound images to the use of images of aborted fetuses, and consequently, argues that its use of ultrasounds is a form of protected speech warranting strict scrutiny under the First Amendment. (Id. at 18.) In response, the City suggests that Hand of Hope's use of ultrasound images is not a form of protected speech. (Def.'s Resp., DE # 54, at 23 ("Assuming that Plaintiff's operation of a medical use constitutes speech, which is far from a foregone conclusion, Plaintiff's operations get no free pass from zoning restrictions."). The City further contends that, even if Hand of Hope's use of ultrasound imaging is a form of protected speech, the zoning regulations in the UDO are content-neutral "time, place, and manner" restrictions subject only to intermediate scrutiny. (Id. at 23-24.)

A State or municipality may regulate speech by imposing "reasonable content-neutral time, place, and manner restrictions that are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th Cir. 2013). A "restriction of speech is content-neutral if it is justified without reference to the content of the regulated speech," whereas "a restriction is content-based if it was adopted because of disagreement with the message the speech conveys." Price v. City of Fayetteville, N.C., 22 F. Supp. 3d 551, 559 (E.D.N.C. 2014) (citing Clatterbuck, 708 F.3d at 555). "Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of

the speaker—is a 'more blatant' and 'egregious form of content discrimination.'" Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2230 (2015) (quoting Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)). If a restriction of speech is content-based, then the regulation is subject to strict scrutiny. See Turner Broad. Sys. Inc. v. F.C.C., 512 U.S. 622, 642 (1994). By contrast, if a regulation is content-neutral, then it is subject to intermediate scrutiny. Id.

Hand of Hope appears to argue that the City's zoning regulations are content-based because the City considered Hand of Hope's viewpoint when determining whether its proposed use of the Property was in compliance with the UDO's zoning regulations. (Pl.'s Supp. Mem., DE # 47, at 20-21.) To show religious animus, Hand of Hope first points to the fact the city council disregarded the findings of the Commission and the City's zoning staff by voting to deny its rezoning request. (Pl.'s Supp. Mem., DE # 47, at 9.) The court first notes that there is no evidence in the record showing that the city council was even aware that Hand of Hope was a religious organization at the time of its decision. In the pre-application materials Hand of Hope submitted to the City in support of its rezoning request, Hand of Hope described its proposed use of the Property as involving office and medical space without any mention of its religious activities or affiliation. (See Crane Decl., Ex. 4, DE # 12-5, at 1; id., Ex. 5, DE # 12-6, at 1.) Moreover, based on a review of the transcript, none of the statements made at the city council meeting support Hand of Hope's suggestion that the decision to deny its rezoning request was due to religious animus. The city council member who moved to deny the rezoning expressed in detail her reasons for denying the rezoning request. (See 7/5/16 Raleigh City Council Tr., DE # 15-3, at 4-6.) She specifically noted how the rezoning request was inconsistent with six policies

in the 2030 Comprehensive Plan, and further explained how the request went against the public interest and would harm the remaining residential property owners. (Id.)

Hand of Hope next argues that the Board's decision to reverse the official zoning interpretation and prohibit Hand of Hope from engaging in medical uses at the Property, while permitting the Kiwanis Club to provide medical services in residential zones and an abortion clinic to operate next door to the Property, suggests that the Board's decision was based on Hand of Hope's pro-life message. (Pl.'s Supp. Mem., DE # 47, at 20-21.) It is undisputed that the Board was aware of Hand of Hope's religious affiliation and viewpoint at the time of its reversal decision. (See Pl.'s App. to Statement of Material Facts, Ex. 6, DE # 49-6 (showing that Hand of Hope identified itself as a religious organization in its request for official zoning interpretation).) The transcript from the 13 February 2017 hearing reveals that Hand of Hope's proposed use of ultrasounds at the Property was an issue of concern for at least two of the Board's members. (See Transcript of 2/13/17 Board of Adjustment Hearing, DE # 35, at 31, 35, 54.) Although these two members ultimately voted to reverse the official zoning interpretation, both members also agreed that Hand of Hope's proposed religious and educational activities were civic uses permitted as of right at the Property. (Id. at 35 ("And I think everyone is in agreement from the perspective of religious belief and thinking. . . . Because of the medical aspect, it takes it out and it changes it from the civic use."); (id. at 54 ("I do believe it to be a civic use. I just also believe it to be a medical use.").) Furthermore, the chair of the Board indicated that the reversal of the zoning interpretation was based on new information presented at the hearing regarding Hand of Hope's licensed medical director that was not under consideration when Crane issued his official zoning interpretation. (Id. at 59.) This evidence, taken in total, does not create a reasonable inference that the Board's basis for concluding that Hand of Hope could not operate its

pregnancy resource center on the Property turned on its religious viewpoint.  Accordingly, the court finds that the zoning regulations at issue in this case do not discriminate on the basis of content or viewpoint.

A content-neutral time, place, and manner restriction must be "narrowly tailored to serve a significant government interest."  Clatterbuck, 708 F.3d at 555.   The City argues that the "ordinances [in the UDO] advance its interests in regulating the use of land within its jurisdiction."  (Def.'s Resp., DE # 54, at 24.)  The court agrees that the City has a significant interest in implementing its development plan and protecting the character of the residential neighborhoods and commercial districts within its jurisdiction.  See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50 (1986) (stating that "a city's interest in attempting to preserve the quality of urban life is one of that must be accorded high respect."  (internal quotation marks and citation omitted)); see also Mom N Pops, Inc. v. City of Charlotte, 979 F.Supp. 372, 390 (W.D.N.C. 1997), aff'd, 162 F.3d 1155 (4th Cir. 1998) (unpublished) ("By this [zoning] ordinance Charlotte seeks to further what is unquestionably a substantial interest in curbing the blighting of neighborhoods and to protect the integrity of schools, churches, and areas where children frequent.").  Moreover, the City's zoning regulations are narrowly tailored to further this significant interest because Hand of Hope can still freely share its pro-life message at the Property through its religious and educational offerings, and can also use ultrasounds as a part of its ministry in any of the other districts that are zoned for commercial use.  Cf. Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 657-58 (10th Cir. 2006) (finding that the city's zoning regulation prohibiting any entity from operating a daycare with more than 12 children in a low-density residential zone did not burden any more speech than necessary because the church-operated daycare could still freely disseminate its message in any zone in the

city, and operate its daycare center in any of the city's 28 zones that were properly zoned for such a facility).

Even if a regulation is content-neutral it must "leave open ample alternative channels of communication." Clatterbuck, 708 F.3d at 555. Hand of Hope does not dispute that the UDO permits it to engage in its religious and educational activities at the Property, including sharing its religious message through counseling, Bible studies, prayer meetings, pamphlets, and other educational materials. However, Hand of Hope emphasizes that the use of live ultrasounds is critical to its ministry because this technology is the most effective form of communication for sharing its pro-life message. (Pl.'s Reply, DE # 61, at 1 ("No lecture or pamphlet can communicate this pro-life information as well as an ultrasound image showing the expectant mother her unborn child—a child who cannot otherwise speak for herself.").) The Fourth Circuit has instructed that a court's inquiry "does not rise or fall on the efficacy of a single medium of expression" and that "the available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." Ross v. Early, 746 F.3d 546, 559 (4th Cir. 2014) (quotation marks and citation omitted). Furthermore, while the available alternatives might not as effectively promote Hand of Hope's message, the City's decision only interferes with Hand of Hope's ability to use ultrasounds in residential zones. The City does not prohibit Hand of Hope from communicating its message through the use of live ultrasounds in the City's commercial zones, which include other properties located on Jones Franklin Road, such as Hand of Hope's previous location. Cf. Grace United, 451 F.3d at 643 ("Even in the context of the proposed daycare center, the ordinance only interferes with the congregation's ability to conduct [a daycare] operation at a specific location[.]"). Therefore, the City's implementation of the

27

UDO appears to leave open sufficient alternatives for Hand of Hope to communicate effectively with its clients.

In sum, even if the court considers Hand of Hope's use of ultrasounds to be protected speech, an issue it does not decide, it finds that the challenged zoning regulations survive intermediate scrutiny. Accordingly, the court will grant summary judgment to the City on this claim.

### 4. Equal Protection

Finally, both parties move for summary judgment on Hand of Hope's equal protection claim. The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Am. XIV, §1. Local governments are therefore prohibited from "denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." Sylvia Dev. Corp. v. Calvert City, 48 F.3d 810, 818 (4th Cir. 1995). The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne Living Ctr. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In order to survive summary judgment on an equal protection claim:

> [A] plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

To determine the appropriate level of scrutiny to apply to a law or ordinance, courts have traditionally applied a two-tiered analysis. Hinton v. Conner, 366 F. Supp. 2d 297, 313 (M.D.N.C. 2005). "Strict scrutiny applies if a person is treated differently based upon

membership in a suspect class or because of the exercise of a fundamental right." Id. (citing Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976)). "When a government classification does not burden the exercise of a fundamental right or disadvantage a member of a suspect class, the government need only show a reasonably conceivable state of facts that could provide a rational basis for the classification." Id.; see also Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir. 2008) (stating that a "challenged classification need only be rationally related to a legitimate state interest unless it violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender"). Additionally, the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); see also Engquist v. Oregon Dep't of Agr., 553 U.S. 591, 601 (2008).

Here, Hand of Hope advances both a selective enforcement claim and an equal protection claim under a "class of one" theory. First, Hand of Hope argues that it was treated differently from other similarly situated organizations that can locate at or near the Property with regard to the enforcement of the UDO's civic use provision. (Pl.'s Supp. Mem., DE # 47, at 24.) Second, Hand of Hope argues that "[t]he City's actions demonstrate the same type of "arbitrary or irrational" behavior that the Equal Protection Clause guards against." (Id.) Under either equal protection theory, Hand of Hope is required to show that it is similar "in all relevant respects" to its comparators. Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).

Hand of Hope initially asserts that the similarly situated organizations in this case are all the places of worship and civic clubs that can locate as of right in residential zones without permission from the City. (Pl.'s Supp. Mem., DE # 26, at 27.) While it is true that Hand of

Hope and its identified comparators are similar insofar as they all engage in civic activities, such a broad interpretation of the similarly situated requirement ignores a relevant distinction between Hand of Hope and these other organizations—that Hand of Hope intends to engage in medical activities on the Property.  Hand of Hope contends that the medical component of its activities is simply a tool for it to communicate its pro-life message.  However, the ultrasounds offered by Hand of Hope are performed by licensed nurses through the supervision of a medical director.  (See Transcript of 2/13/17 Board of Adjustment Hearing, DE # 35, at 30-31, 41-42.)  The testimony offered at the Board hearing reveals that Hand of Hope's nurses use live ultrasounds not only to communicate its message but to interpret the results of the ultrasounds to its clients.  (Id. at 41.)  Moreover, Hand of Hope voluntarily follows HIPPA procedures with regard to its clients and the information it obtains via the ultrasounds.  (Id. at 43.)  These medical activities significantly differ from the religious and educational activities of the other organizations that Hand of Hope claims were allowed to locate in residential zones as of right without prior approval from the City.[8]  Accordingly, the court finds these organizations are not similarly situated to Hand of Hope.

Hand of Hope also identifies the abortion clinic next door to it as a similarly situated organization.  (Pl.'s Supp. Mem., DE # 26, at 27.)  Hand of Hope cites to the fact the A Preferred Women's Health Center obtained the city council's approval of its rezoning request as evidence that it was treated differently.  (Id.)  It is apparent from the very nature of an abortion clinic that it engages in medical activities similar to Hand of Hope.  However, at the time the rezoning

---

[8] The court notes that Hand of Hope has submitted evidence that the Kiwanis Club provided medical services to members of the community for an 11-year period.  (See Short History of Kiwanis Club of Raleigh, DE # 26-8, at 17.)  However, as previously discussed, there is no evidence in the record to support Hand of Hope's claim that the Kiwanis Club engaged in these medical activities within one of the City's residential zoning districts.

request was made in 1996, A Preferred Women's Health Center was not the owner of the neighboring property. (Eldredge Decl, Ex. 22, DE # 56-9, at 2.) The neighboring property was in fact owned by a real estate appraiser, who intended to operate a real estate business from the structure on the property. (Id.) Additionally, the city council considered the rezoning request under different land use regulations as the UDO had yet to be adopted by the City. (See Ordinance Adopting UDO in 2013, Crane Decl., Ex. 2, DE # 12-2.) Consequently, it is clear from the record that Hand of Hope is not similarly situated to A Preferred Women's Health Center.

Because Hand of Hope cannot offer any evidence of any similarly situated comparator that was treated differently from it by the City with respect to the enforcement of the UDO's zoning regulations, Hand of Hope's equal protection claim must fail.

## B. Motion for Preliminary Injunction

Hand of Hope requests the court enter an injunction prohibiting the City from interfering with its ability to use the Property as location for its pregnancy resource center. (Pl.'s Mot., DE # 25, at 1.) Additionally, Hand of Hope asks the court to enjoin the City from interfering "with the ability of women who seek or may seek Hand of Hope's information, education and support at the Property." (Id.) Hand of Hope asserts that such relief is necessary to keep the City from "further prohibiting Hand of Hope's exercise of its religious and expressive activities at the Property and from causing any further irreparable harm to its ministry and the individuals who seek and benefit from it." (Pl.'s Supp. Mem., DE # 26, at 1.)

The grant of a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also MicroStrategy Inc. v. Motorola, Inc., 245 F.3d

335, 339 (4th Cir. 2001) (stating a preliminary injunction is an "extraordinary remed[y] involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances"). In order to obtain a preliminary injunction, a movant must establish the following: (1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. <u>Winter</u>, 555 U.S. at 20.

Hand of Hope makes the following merit-based arguments in support of its motion for preliminary injunction: (1) the City's actions violated both the "equal terms" and "substantial burden" provisions of RLUIPA; (2) the City's actions restricted Hand of Hopes speech in a manner that violated the First Amendment; and (3) the City's actions violated Hand of Hope's right to equal protection under the Fourteenth Amendment. As explained above, the court has determined that the City is entitled to summary judgment on Hand of Hope's constitutional claims under the First and Fourteenth Amendments. Additionally, this case presents questions of fact that prevent this court from concluding on the present record that Hand of Hope has met its burden of establishing a prima facie case under RLUIPA's equal terms provision. Accordingly, with respect to three of its claims, Hand of Hope has failed to establish a "clear showing" that it is likely to succeed on the merits.

The court notes that the parties did not include in their cross-motions for summary judgment any argument pertaining to Hand of Hope's claim under the substantial burden provision of RLUIPA. With respect to this claim, Hand of Hope contends that the City's existing land use regulations and the City's denial of its rezoning request imposed a substantial burden on its religious exercise. (Pl.'s Supp. Mem., DE # 26, at 18.) The substantial burden provision prohibits a municipality from implementing a land use regulation in a manner that:

> imposes a substantial burden on the religious exercise of a person,
> including a religious assembly or institution, unless the
> government demonstrates that imposition of the burden on that
> person, assembly, or institution—
> (A) is in furtherance of a compelling governmental interest; and
> (B) is the least restrictive means of furthering that compelling
> governmental interest.

Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 557 (4th Cir.

2007).  While RLUIPA does not define "substantial burden," the Fourth Circuit has defined it as

"when a state or local government, through act or omission, puts substantial pressure on an

adherent to modify his behavior and to violate his beliefs."  Lovelace v. Lee, 472 F.3d 174, 187

(4th Cir. 2006).  The Fourth Circuit has also emphasized that "a critical function of RLUIPA's

substantial burden restriction is to protect a plaintiff's *reasonable* expectation to use real

property for religious purposes."  Andon, LLC v. City of Newport News, Va., 813 F.3d 510, 514

(4th Cir. 2016) (emphasis added); see also Bethel, 706 F.3d at 557 ("When a religious

organization buys property reasonably expecting to build a church, government action impeding

the building of that church may impose a substantial burden.").  Accordingly, the relevant

inquiry is whether Hand of Hope has a reasonable expectation of using the Property as a

pregnancy resource center at the time it bought the Property.

The evidence in the record shows that when Hand of Hope first learned of the Property's

availability in 2015, the Property was improved with a single-family residence and located

within a residential zone.  (Am. Compl., DE # 40, ¶ 17, 27.)  At the time Hand of Hope

purchased the Property, it was aware that the Property was designated for office mixed use under

the City's 2030 Comprehensive Plan.  (Summers Decl., DE # 26-2, ¶ 13.)  The only other

information Hand of Hope had concerning the Property was from its contractor, Joseph

Summers, who believed that rezoning was necessary based on his knowledge of four similar

parcels the City had granted rezoning approval between 1999 and 2006. (Id. ¶¶ 7-9.) Hand of Hope did not consult with any City official about the zoning applicable to the Property until after it purchased the Property in December 2015. (Id. ¶ 17.) When Hand of Hope finally contacted the City after purchasing the Property, the City's zoning staff advised that rezoning would be necessary. (Id. ¶ 18.) Hand of Hope may have believed there was a possibility that its rezoning request would be approved as its proposed use was consistent with the 2030 Comprehensive Plan. However, even though commercial uses will eventually be permitted as of right at the Property, such uses are prohibited by the existing zoning map. Cf. Bethel, 706 F.3d at n.4 (noting that a church had a reasonable expectation of using property where the county permitted churches in the area at the time the church bought its property, and sought to build a church on the Property long before the county passed an ordinance prohibiting its construction). Furthermore, rezoning approval would not only depend on Hand of Hope's proposed use being consistent with the zoning map contained in the 2030 Comprehensive Plan but also the policies set forth therein. Although Summers advised Hand of Hope that similar parcels had obtained rezoning approval in the past, there is no evidence in the record showing that the City had granted rezoning approval to similar parcels since the adoption of the 2030 Comprehensive Plan in 2009.

Given the existing zoning regulations and the absence of information regarding the city council's treatment of rezoning requests following the adoption of the 2030 Comprehensive Plan, the evidence before the court suggests that Hand of Hope did not have a reasonable expectation that it would be permitted to operate its pregnancy resource center on the Property. Cf. Reaching Hearts Int'l, Inc. v. Prince George's Cty., 584 F. Supp. 2d 766, 792 (D. Md. 2008), aff'd, 368 F. App'x 370 (4th Cir. 2010) (affirming the jury's finding of substantial burden

because the plaintiffs had reasonably expected to build a church on the property based on the then-current state of the law and the track record of the agencies that would be reviewing the application when they invested hundreds of thousands of dollars into application processes). Accordingly, the court finds that Hand of Hope has not made a "clear showing" of likelihood of success on the merits on its substantial burden claim, or any of its other claims. Therefore, a preliminary injunction is not warranted in this case.

### III. CONCLUSION

For the foregoing reasons, Hand of Hope's motion for partial summary judgment is DENIED, and the City's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, summary judgment is GRANTED to the City with respect to Hand of Hope's free speech and equal protection claims. Hand of Hope's claim under RLUIPA's equal terms and substantial burden provisions remain, along with its claims against the City for undue burden placed on a woman's fundamental right to have access to information concerning pregnancy and undue burden on an unborn child's fundamental right to begin life with a sound mind and body.

This 27 July 2018.


_____
W. Earl Britt
Senior U.S. District Judge